*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* GORDON/ROBINSON/COHOON, Minors.

UNPUBLISHED
April 11, 2024

No. 366125; 366175
Bay Circuit Court
Family Division
LC No. 21-013176-NA

Before: PATEL, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

In Docket No. 366125, respondent-mother appeals as of right the order terminating her parental rights to the minor children, JG, TG, ZG, HR, and SC, under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care and custody), and (j) (likelihood of harm if returned to parent). In Docket No. 366175, respondent-father appeals as of right the order terminating his parental rights to the minor child, JG, under MCL 712A.19b(3)(a)(*ii*) (parent has deserted child for 91 or more days), (c)(*i*), (c)(*ii*), (g), and (j). We affirm.

## I. FACTUAL BACKGROUND

This case arises out of a petition for temporary custody filed by the Department of Health and Human Services (DHHS). In the petition, DHHS stated:

> [Mother] gave birth to [SC] on 3/23/21. [SC] was positive for Amphetamines and methamphetamines. [SC] was born at 32 weeks and is in the NICU. [Mother] has four other children in her care, [JG], [TG], [ZG], and [HR]. Forensic interviews were completed with [ZG] and [TG] and they disclosed that they get locked in their rooms and had to climb out the window to go to the bathroom. [TG] further disclosed that he saw [SC's father] tie [JG] to the bed and she had to eat through the rope to break free. [ZG] reports that [SC's father] hurts him by spanking him and has left bruises on him. He further stated that [SC's father] hurt his ankle because he snuck out of the home. [ZG] and [TG] are currently at their [m]aternal grandfathers [sic] home. The [m]aternal grandfather sexually abused [mother] when she was a child.

-1-

The petition noted that father[1] was incarcerated at the time. DHHS asked the court to take temporary jurisdiction over the children. A preliminary hearing was held on April 15, 2021. That same day, an amended petition was filed, indicating that father had been identified. The children had been temporarily removed from mother's care pending a court ruling on the petition. Mother and father waived a finding of probable cause at the hearing, and the court authorized the petition. The trial court heard suggestions for relative placements for the children from mother's and father's respective counsel, but determined that it would be best for them to be placed in foster care at that time. At a later pretrial hearing, the referee noted that DHHS had sent documentation to relatives regarding placement and that home studies would need to be completed. In the meantime, the three older children and the two younger children had been placed in separate foster homes because there were no placements available with room to house all five children.

A two-day adjudication hearing was held on July 28, 2021, and August 2, 2021, as to mother. Mother pleaded no contest to the jurisdictional grounds alleged in the petition. A case service plan (CSP) was put in place, and mother was ordered to attend parenting time, participate in substance abuse treatment, mental health treatment, and parenting classes. Mother was also required to find stable employment and housing.

A series of dispositional review hearings took place between August 2021 and August 2022. At an August 2021 hearing, a foster care case manager testified that mother was not consistently attending parenting time visits. When she did attend visits, her behavior was mostly appropriate, although the case manager indicated that sometimes mother did not want to hold HR or comfort her. The case manager indicated that she was working with mother to help her manage the children's needs. DHHS was also working with mother to get her engaged with substance abuse and mental health treatment. Regarding father, the case manager testified that father was writing letters to JG from prison and would be permitted to continue doing so. Regarding relative placement, another foster care case manager indicated that she was performing background checks on relatives who had been suggested as potential placements for the children. Both workers recommended that the children remain in their current placements and that mother continue to follow her CSP.

Two months later, at a November 2021 review hearing, a foster care worker testified that the children were doing well in their foster care placements, had been going to school regularly, and were attending therapy. JG had received a letter from father informing her that he was her father and had processed it in therapy. Father sent one other letter to JG as well. The children's case worker recommended that father continue sending letters to JG. The case worker had not received any communications from father's relatives. The foster care worker noted that mother had not complied with her CSP. She continued to test positive for methamphetamines, had not obtained a psychological evaluation, and had missed at least 50% of her parenting time visits. Barriers to reunification remained, including "substance abuse, parenting skills, emotional stability, housing, employment, [and] domestic relations[.]" The trial court continued its prior orders regarding mother's CSP and allowed father to continue writing letters to JG, but noted that

---

[1] JG and her siblings do not share a father, but none of the other children's fathers participate in this appeal. For the sake of simplicity, respondent-father will simply be referred to as "father."

he should start sending more frequent letters. The court indicated that reunification remained the goal.

A three-day bench trial was held as to father in December 2021 and January 2022. Relevant to this appeal, a Children's Protective Services (CPS) worker testified that she contacted some of father's relatives, including father's parents, who live in Texas, and his grandmother, who lived in Hawaii at the time. The CPS worker testified that it was agency preference to keep JG with her siblings in Michigan rather than send her out of state to live with relatives she had never met and with whom she had no established relationship. JG's paternal grandmother testified that she was aware that JG was her granddaughter, but had never met her. She explained that she had no way to contact mother, although she tried to do so through Facebook and received no response. She testified that she and her husband, JG's paternal grandfather, were willing to take JG in and have her live with them in Texas.

Regarding father's fitness to parent JG, the worker testified that father could not provide care and custody of JG because he was currently incarcerated and had been incarcerated since JG and her siblings were removed from mother's care. Father testified that once he learned mother was pregnant with JG, he tried to contact her, but was unsuccessful. He later learned that JG might be someone else's child, but ultimately confirmed that he was JG's father through a paternity test. He was ordered to pay child support, but testified that he was not offered an opportunity to be involved in JG's life. Father agreed that he left mother to raise JG until JG and her siblings were removed from mother's custody. He testified that he attempted to find JG while out of prison between 2016 and early 2018, but never filed an action with a court to attempt to establish custody. He finally determined that JG and mother were in Michigan after receiving an order from a Michigan court indicating that he owed more than $10,000 in child support.

Father has been in prison since 2018, and had been in and out of prison for approximately seven years. He stated that he would be eligible for parole soon, and testified that he would prefer JG live with his parents in Texas until he was released. He testified that he had a house and a car that his parents were maintaining for him, and that he would be able to provide for JG, but that it might take him up to a year and a half to be stable enough to care for JG on his own. At the conclusion of the hearing, the trial court found that the evidence supported exercising jurisdiction over JG under MCL 712A.2(B)(1). Father was granted supervised parenting time and permitted to write letters to JG. A CSP was later put into place, requiring father to attend substance abuse education and support groups, life skills and life decision programs, and maintain employment in various areas while he was in prison.

A dispositional review hearing regarding father was held on February 9, 2022. Testimony indicated that JG was doing well in her foster care placement. Father had sent letters to JG, but the children's guardian ad litem noted that some of the letters contained inappropriate content regarding mother and the court. The foster care worker agreed that the content in some of the letters was inappropriate for JG. She recommended that father continue sending letters and adhering to his CSP while in prison. She further testified that JG's paternal grandparents sent JG a Christmas present and a binder containing information about her family in Texas. They had also started the process to be eligible as a potential placement for JG.

The court conducted a review and permanency planning hearing on February 18, 2022. A foster care worker indicated that all of the children were thriving in their foster placements. Mother continued to fail to meet the terms of her CSP. Mother's attendance at parenting time visits was inconsistent. Her substance abuse issues were not under control and she admitted to using drugs, but stated that she wanted to be sober. Mother was not consistently engaged in any mental health treatment. She remained unemployed. She also indicated that she wanted to co-parent with one of the children's fathers, who had been violent toward her in the past. Regarding father, the worker indicated that she had sent parenting worksheets and return envelopes to him so that he could send letters to JG. She had not heard from father since December. Father's barriers to reunification remained emotional stability and parenting skills. The worker continued to support the goal of reunification, provided that mother made quick effort to adhere to the CSP and that father resumed contact with her and with JG.

Dispositional review hearings were again held in May and August 2022. Mother continued to test positive for methamphetamines. She had completed a psychological evaluation, but had not enrolled in mental health treatment. Father's barriers to reunification also remained, and the foster care worker testified that father had unresolved issues pertaining to incarceration, substance abuse, emotional stability, and parenting skills. Father was unable to obtain a substance abuse assessment while in prison and was waitlisted for anger management classes. He was attempting to stay in contact with the foster care worker. He had completed parenting worksheets as assigned by the worker, and had written several letters to JG.

By the time the August 2022 hearing was held, relations between mother and the children during parenting time had completely deteriorated. The children began crying during visits, and CPS workers believed that continuing the visits would be harmful to the children. Similarly, testimony indicated that father was not returning parenting skills packets to JG's foster care worker, but that he had written two letters to JG during the reporting period. JG's paternal grandparents were aware that JG was in foster care but had made no attempt to have any further contact with her. The foster care worker testified that father was doing what he could while in prison, but that he would not be released on parole for at least another two years. Termination of mother's and father's parental rights was recommended.

A supplemental petition for termination of parental rights was filed on November 1, 2022, stating that statutory grounds supporting termination of mother's parental rights existed under MCL 712a.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), and of father's parental rights under MCL 712A.19b(3)(a)(*ii*), (c)(*i*), (c)(*ii*), (g), and (j). Mother's parenting time visits were subsequently suspended at a review hearing held on November 8, 2022, as the visits were becoming increasingly harmful for the children. At the same hearing, it was noted that father's earliest release date from prison was January 31, 2026. Father had been moved around in the prison system multiple times during the reporting period, and did not appear to be complying with his CSP or communicating with the worker or JG. Due to the pending termination, it was recommended that father no longer be permitted to write letters to JG.

Trial on the petition began January 26, 2023. Testimony from various foster care and CPS workers indicated that mother had not complied with her CSP. Additionally, she had tested positive for methamphetamines nearly the entire time that the children were in foster care, and could not manage five children at once during parenting time, despite having a bond with them.

-4-

Relevant to this appeal, a foster care case manager indicated that the children's maternal grandmother, who had recently moved from Michigan to Georgia, had expressed interest in fostering the children prior to the filing of the termination petition. CPS had not completed an investigation into whether her home would be an appropriate placement because she lived in Georgia. At the time, the supplemental petition for termination had not yet been filed, and reunification with the children was the goal. It was DHHS's opinion that placing the children with relatives out-of-state would not be conducive to meeting that goal. Similarly, JG's paternal grandparents had requested that JG be placed with them in Texas, but that placement was not seriously considered.

Regarding father, the worker testified that his earliest prison release date was in 2026. She agreed that father had sent JG a total of 11 letters and that they were generally appropriate, but that it was suggested that he write at least two letters per month and had failed to do so. JG wrote one letter in response to father's letters, but when she was encouraged to write more, she declined. The worker further observed that father had not complied with his CSP and made little effort to participate in programs offered by the prison.

On the second day of trial, a foster care worker again testified that father's original prison release date was scheduled for 2024, but had been extended to 2026. He was not in compliance with his CSP. When asked whether it would be appropriate to place JG in a guardianship with her paternal grandparents until father was released from prison, the worker noted that such an arrangement would not be considered because DHHS was seeking termination of father's parental rights. Moreover, the worker noted that JG's paternal grandmother indicated in her earlier testimony that it would be too expensive to bring her back and forth from Texas to Michigan, suggesting that she would not attempt to continue the bond between mother and JG.

Mother testified that she believed a guardianship with the children's maternal grandparents would be appropriate as long as they continued living in Georgia, where they were staying with mother's sister. Mother conceded that both of her parents had struggled with substance use issues as recently as 2021, but stated that they were doing better in Georgia. She denied stating that her father, who would also be living on the Georgia property, had sexually abused her as a child, although the initial petition in this case stated otherwise. A case manager again testified that it was DHHS's policy not to consider out-of-state placements until after the parents' rights had been terminated, in order to prevent moving the children back and forth unnecessarily. She also testified that guardianship in Georgia was not considered with any seriousness because at one point, mother told her that she did not want the children to go live with their grandmother in Georgia.

The children's maternal grandmother testified on the third day of the trial, stating that she was willing to have the children come live with her in Georgia. At that time, she and her husband lived with mother's sister in a mobile home on a parcel of land with several properties on it. She explained that she had asked to foster the children in March 2022, after the children had already been in foster care for approximately a year, but said that DHHS never followed up with her regarding her request. Regarding the viability of long-term guardianship, another foster care worker explained that such guardianships were not recommended in cases where the children would remain in contact with a parent who continued to be inconsistent and unstable. DHHS's opinion was that there was no viable option for guardianship with mother's family in this case because mother was not a stable presence in the children's lives.

On the sixth day of trial, the children's therapist testified that it would not be beneficial for JG to maintain a relationship with father because at that point in the proceedings, father was essentially just "a pen pal with the name of Dad." She testified that JG simply did not know father personally and that it would not be in her best interests to continue a relationship with him. She further testified that she did not believe mother or father would be able to provide the children with stability and permanency in a reasonable amount of time.

The following day, father testified that he had been inconsistent with writing letters to JG because he was moved around in the prison system multiple times and that some of his letters ended up returned to him without ever having been sent. He stated that he attempted to fill out parenting packets and return them to the case worker, but that he sometimes did not have enough stamps to send them. He stated that he could not participate in many programs while in prison, in order to comply with his CSP, because many of them had waitlists or were otherwise unavailable. He continued to request that JG be placed in a guardianship with his parents. He explained that he expected to be released from prison by October 2023 and that he had a job lined up for after his release, as well as a house and a car.

On May 1, 2023, the court issued its final opinion. The court found that DHHS made reasonable efforts toward reunification for mother and father prior to filing the supplemental petition for termination. As to the termination of mother's parental rights, the court found that mother made no progress managing her substance abuse or mental health issues, had failed to maintain stable employment and appropriate housing, had missed 97 of 218 parenting time visits, and had shown up late for 24 visits. The court thus found that statutory grounds for termination existed under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).

The court acknowledged that mother had requested that the children be placed under guardianship with her parents in Georgia, and that her parents were willing to enter into a guardianship until mother could achieve reunification with the children. The trial court declined to place the children under guardianship, noting that the children had already been in foster care for 550 days since the filing of the original petition, with no apparent improvement in the conditions that led to adjudication. The court further explained:

> At the removal of the children mother was asked if there were any suitable relatives to take care, to take her children into care and mother did not provide any names. Mother went even further than that. When asked about her parents she stated she did not want her children to go to her parents because they were substance abuse users. When asked about this at the termination trial mother stated since they moved to Georgia they no longer use substances. She felt that as long as her parents lived in Georgia and on her sister's property that the children would be safe.

> The Court does not believe that this alternative would achieve proper care and custody. The statute is very clear when requesting placement with a relative it needs to be done in a certain time period at the beginning of the case and not at the tail end of a case when it's clear mother cannot overcome her barriers.

The court reasoned that placing the children under guardianship in the circumstances presented would not afford them the stability and permanency they deserved. The court found that termination of mother's parental rights was in each child's best interests.

As to father, the court found that statutory grounds for termination existed under MCL 712A.19b(3)(a)(*ii*), (c)(*i*), (c)(*ii*), (g), and (j). The court explained:

> The Supreme Court in [*In re Mason*, 486 Mich 142; 782 NW2d 747 (2010)] made it clear that just incarceration alone does not constitute grounds for termination, a criminal history alone does not justify termination. While standing alone they may not be grounds for termination, but when coupled with other findings they should not be ignored.
>
> * * *
>
> Father knew at the time of the removal in Texas that mother had substance abuse problems, and yet, left his daughter with her and her partner . . . . He pretty much walked away. At the time of the removal, . . . the paternal grandparents, who father is now putting forth as placement, declined to take her. Also, through further testimony it was discovered that father nor his parents have ever met [JG].
>
> After this testimony the agency determined that identified barriers were substance abuse, mental health, criminality, and parenting. Due to father's incarceration the agency was unable to administer any psychological evaluations or substance abuse evaluation. It is hard to guess if the father can maintain sobriety outside of an institutional setting when he has spent the majority of his adult life incarcerated.

The court observed that DHHS attempted to engage father in letter writing and parenting education, with mixed success, and that his adherence to his CSP was similarly mixed. The court also noted that father's earliest release date from prison appeared to be January 2026, and that there was no evidence that he would be able to provide proper care and custody of JG in a reasonable amount of time. Further, the court opined that despite knowing of mother's drug problem years before the children came into DHHS's care in 2021, father never attempted to meet JG or establish custody of her. Regarding a potential guardianship placement, the court opined that removing JG from a foster care placement with her siblings and placing her with her paternal grandparents in Texas would not be in her best interests. The court additionally concluded that termination of father's parental rights was in JG's best interests because he could not provide her with stability and permanency within a reasonable amount of time.

An order terminating mother's and father's parental rights was subsequently entered. This appeal followed.

## II. ANALYSIS

### A. DOCKET NO. 366125

Mother argues that the trial court erred by declining to place the children in a guardianship with her parents in Georgia. We disagree.

There is no dispute that statutory grounds for termination were established in this case. Once a statutory ground for termination has been established by clear and convincing evidence, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When evaluating whether termination is in a child's best interests, "[t]he trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (citation omitted). Factors to be considered in making the determination include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. (quotation marks and citation omitted). The trial court may also consider the child's wellbeing while in care and the possibility of adoption. *Id*. at 714 (citation omitted). At the best-interests stage, the court's focus must be on the child and not the parent. *In re Moss,* 301 Mich App at 87. A trial court must consider each child's best interests. *In re Olive/Metts*, 297 Mich App at 42. However, a trial court need not, make "individual" and "redundant factual findings" if the children's interests do not significantly differ. *In re White*, 303 Mich App at 715-716.

Initially, mother notes that DHHS had a "responsibility to expend reasonable efforts to provide services to secure reunification," *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012), including a duty to investigate potential relative placements for the children, prior to the filing of the supplemental petition for termination of parental rights. See MCL 722.954a. She faults DHHS for failing to investigate whether it would have been appropriate to place the children in foster care with her parents in Georgia while the proceedings were ongoing.[2] In general, under MCL 722.954a(2),

---

[2] We emphasize that mother has waived any challenge to the trial court's decision that three statutory grounds existed in support of termination. Accordingly, her arguments regarding guardianship may go to the best-interest determination, but they cannot serve as an affirmative defense to the decision to terminate parental rights. See, e.g., *In re BZ*, 264 Mich app 286, 301;

(2) Upon removal, as part of a child's initial case service plan . . . the supervising agency must, within 30 days, identify, locate, notify, and consult with relatives to determine placement with a fit and appropriate relative who would meet the child's developmental, emotional, and physical needs. Preference shall be given to an adult related to the child within the fifth degree by blood, marriage, or adoption provided the relative meets all relevant state child protection standards. *The department may make an exception to this preference only if good cause is shown*. As used in this section, "good cause" means any of the following:

(a) A request by 1 or both of the child's parents to deviate from this preference.

(b) The child's request, if the child is of sufficient age and capacity to understand the decision that is being made.

(c) The presence of a sibling attachment that can be maintained through a particular placement.

(d) The child's physical, mental, or emotional needs, such as specialized treatment services that may be unavailable in the community where families who meet the placement preferences live.

(e) The distance between the child's home and the proposed family placement would frustrate the reunification goal or otherwise impede permanency. [Emphasis added; see also the *Children's Foster Care Manual*, FOM 722-03, pp 2-4 (discussing standard procedures for evaluating and placing children with relatives).]

While a relative placement should ordinarily be considered and prioritized over placement in foster care, DHHS showed good cause for declining to do so here. First, mother indicated that she would prefer the children *not* be placed with her parents in Georgia because her parents also struggled with substance abuse issues as recently as 2021. Additionally, at a review and permanency planning hearing, a CPS worker explained that DHHS considered the option of placing the children with mother's parents, but decided against it because it would be difficult for the children to maintain a bond with their mother if they were moved out of state. The record indicates that the children had already been in foster care for approximately a year before their grandmother sought to have them placed with her in Georgia, and were doing well in their placements. Moreover, although mother later denied it, there were allegations that her father—the children's paternal grandfather—had sexually abused her as a child. Under the circumstances, it would have been detrimental to the children to uproot them from their foster placements and send them out-of-state to live with relatives in Georgia. Good cause for declining to place the children with relatives existed under MCL 722.954a(2)(a) and (e).

---

690 NW2d 505 (2004) (a court may terminate parental rights even when a juvenile guardianship exists if it makes the appropriate best interest findings).

Mother also argues that the trial court should have placed the children under guardianship instead of terminating her parental rights. Generally, "guardianships are one of a few options available to a court when it determines that termination of parental rights is *not* in the best interests of the minor child." *In re Prepodnik*, 337 Mich App 238, 243; 975 NW2d 66 (2021). Put differently, "the appointment of a guardian is only appropriate after the court has made a finding that the child cannot be safely returned to the home, yet initiating termination of parental rights is clearly not in the child's best interests." *In re TK*, 306 Mich App at 707. Guardianships are largely only appropriate where "an ongoing relationship with [the parent]—rather than termination—is in the children's best interests." *In re Mason*, 486 Mich 142, 169; 782 NW2d 747 (2010). Here, the prospect of placing the children under guardianship was not raised until after the supplemental petition to terminate mother's parental rights was filed, and the trial court ultimately found that termination was in the children's best interests. The court believed that mother's continued substance abuse, housing and economic instability, and inability to adequately parent the children would continuously harm them. The court thus concluded that the stability and security of a permanent adoptive placement with the children's respective foster families would be more appropriate than continuing mother's unstable relationship with the children.

We agree with the trial court's assessment. Mother has made no significant progress toward reunification. The record shows that she made little to no progress to address her substance abuse and mental health issues, her poor domestic relationships, or her ability to maintain a stable job and housing over the course of the 500-plus days that the children were in foster care. Had she demonstrated a willingness to fix these issues and provide a stable and loving home for the children at any point in the proceedings, a guardianship may have been an appropriate alternative to termination. But as it stands, allowing mother's relationship with the children to continue would likely only lead to more emotional and mental distress for them. The children deserve stability and permanency, which mother has simply not shown she can provide in a reasonable amount of time, regardless of whether the children are placed under guardianship. Accordingly, the trial court did not err by finding that terminating mother's parental rights was in the children's best interests, and that a guardianship would not have been appropriate here.

B. DOCKET NO. 366175

Father argues that the trial court erred by finding that statutory grounds existed to support termination of his parental rights under MCL 7.215A.19b(3)(a)(*ii*), and that the trial court erred by declining to consider a guardianship for JG with her paternal grandparents. We disagree.

"We review for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence. A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Richardson*, 329 Mich App 232, 251; 961 NW2d 499 (2019) (citation omitted). "To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

Under MCL 712A.19b(3)(a)(*ii*), a trial court may terminate parental rights if it finds clear and convincing evidence that "[t]he child's parent has deserted the child for 91 or more days and

has not sought custody of the child during that period." We agree with the trial court that termination was appropriate under this subsection. Respondent had been incarcerated out-of-state and had no contact with JG for a period of time significantly longer than 91 days. While we agree that "incarceration alone is not a sufficient reason for termination of parental rights[,]" *In re Mason*, 486 Mich at 146, the record indicates that father has never met JG, and at no point did father try to be involved as a father figure in JG's life. At most, father briefly attempted to contact mother when it was established that he was JG's father. However, he never sought custody of JG and owed approximately $10,500 in child support arrears. Even when he was not incarcerated, he made minimal attempts to contact JG or be a part of her life. Ultimately, father only began to show an interest in parenting JG after she was removed from mother's custody. On this record, there was clear and convincing evidence that respondent had deserted and abandoned JG for more than 91 days. The trial court did not clearly err in finding that termination was proper under MCL 712A.19b(3)(a)(*ii*). Because only one ground needs to be proved by clear and convincing evidence, see *In re Ellis*, 294 Mich App at 32, we decline to review the remaining grounds supporting the termination of father's parental rights.

We additionally reject father's claim that JG should have been placed under guardianship with her paternal relatives for similar reasons as those for which we rejected mother's claim that the children should have been placed under guardianship with her maternal relatives. As previously noted, when evaluating whether termination is in a child's best interests, "[t]he trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713 (citation omitted). The court should consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. (quotation marks and citation omitted). A guardianship is only appropriate if termination is not in a child's best interests. *In re TK*, 306 Mich App at 707. There is no evidence that father had established a bond to JG in this case, or that he has the capacity to provide permanency and stability to JG in the near future. Father is asking that JG be removed from her foster care placement and placed alone with her paternal relatives in a new state. Father suggests that this would be a positive arrangement because JG would be able to get to know her paternal relatives and her father, and vice versa. However, father spares little thought for whether removing JG from her current foster placement, where she lives with two of her siblings and is reportedly thriving, would be in her best interests. At the best-interests stage, the court's focus is on the child, not the parent. *In re Moss,* 301 Mich App at 87. Termination was in JG's best interests, and under the circumstances, we agree with the trial court that a guardianship would not have been appropriate.

Affirmed.

/s/ Sima G. Patel
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney